HUNTER, JR., Robert N., Judge.
Elton Samuel Moss[1] ("Defendant") appeals from his jury conviction of assault with a deadly weapon inflicting serious injury. We find reversible error in part and no error in part, and grant Defendant a new trial.
I. Factual and Procedural Background
On 4 August 2015, Defendant and Wayne Odom ("Odom") had an altercation during which Defendant stabbed Odom. It was not the first time the men had encountered one another; they had a previous altercation on 13 July 2015, about three weeks before the stabbing incident.
On 2 May 2016, the Grand Jury of Clay County indicted Defendant for assault with a deadly weapon inflicting serious injury.[2] On 12 December 2016, Defendant gave notice he intended to pursue a defense of self-defense.
In this case, Defendant contends the trial court erred by (1) failing to instruct the jury that Defendant had no duty to retreat; (2) failing to intervene in the prosecutor's argument; and (3) allowing the prosecutor to cross-examine Defendant concerning his rights to silence and to counsel.
A. Voir Dire
During Defendant's trial for the 4 August 2015 stabbing, the court conducted a voir dire hearing to consider whether to allow evidence of the prior 13 July 2015 altercation involving Defendant and Odom. From that hearing, the court's findings of fact included, among other things: (1) Defendant admitted to stabbing Odom but claimed self-defense; and (2) Defendant offered evidence of the prior incident to show evidence of intent in the August incident, state of mind relevant to reasonableness of the self-defense allegation, and evidence of whether Defendant or Odom was the aggressor in the August assault. The court concluded as a matter of law: (1) the evidence of the prior assault on Defendant was "sufficiently similar to the offense charged and close enough in time to be admissible pursuant to 404(b)"; and (2) the evidence was admissible to show "[D]efendant's intent on 4 August 2015," "the alleged victim's intent relating to the [D]efendant's assertion of self-defense," "[D]efendant's state of mind relevant to his claim of self-defense," and "whether the [D]efendant or the victim was the aggressor ... relevant to the [D]efendant's self-defense claim[.]" The court further concluded the "probative value of this evidence outweighs any chance of undue prejudice to either side," and the "evidence in question is relevant to the [D]efendant's claim of self-defense and non-confusing to the jury." Accordingly, the court allowed Defendant to testify in the instant case as to the 13 July 2015 assault on him and his resulting injuries, limited to the 404(b) purposes.
B. 13 July 2015, Previous Altercation
1. Odom's Version
Odom, Defendant's brother-in-law,[3] testified that on 13 July 2015, Defendant had "screwed somebody over and got the crap beat out of him for it." Odom was not involved, but he was there. Although Odom did not have a baseball bat, there were two at the scene. Defendant was seriously injured and had to be taken to the hospital by ambulance. Odom had no weapon with him, and he did not defend Defendant because "[Defendant] was down there with another woman."
2. Defendant's Version
Defendant testified he was with Amanda Locklear ("Locklear") camping by a creek on 13 July 2015, about three weeks before the stabbing incident. Odom, Ed Robinson ("Robinson"), and Jamie Moore ("Moore") came through a pasture to the campsite, Moore arriving on an ATV, and Odom and Robinson arriving by vehicle. Moore "stayed over in the weeds," but Odom and Robinson "got out with ball bats, start[ed] running their mouth ... and words were exchanged[.]" Odom was "ranting and raving" that Defendant should not be there with another woman, since he was still married to Jackie. As the argument "started escalating," Defendant "reached down and grabbed" his bat, from under the seat of his van. Robinson "reared his back ... and just lunged in to hit [Defendant.]" Robinson, who "wanted to try to finish it off right there, came at Defendant with the baseball bat raised and "swinging down at him." Defendant "hit him somewhere," since "[Robinson] was already in full swing to hit [Defendant]." Odom grabbed Defendant's bat. Robinson hit Defendant in the head, and Defendant fell to the ground and "started blacking out from then."
In voir dire, Defendant testified that Robinson said, and Odom agreed, "they were gonna leave [Defendant] for dead[,]" "[t]his is the end of it right here[,]" and "when they were done with [Defendant] the fish [were] gonna eat him up[.]" Odom threw Defendant's bat into the creek. Defendant remembered hearing Robinson say "we got to get rid of the evidence," and seeing his bat "go flying through the air into the creek."
Defendant's arm was shattered; his hand was crushed; his skull was fractured ; he was bleeding out of his ear; he had "about" twenty broken ribs, where he had been kicked with Odom's boot; and he blacked out. He woke as Locklear poured water on his face, and she then drove him to the hospital. Robinson was charged with the incident.
B. 4 August 2015, Defendant Stabs Odom
1. Odom's Version
The State called Odom. On 4 August 2015, at about 10:00 or 10:30 p.m., Odom and Defendant met up on the Square in Hayesville. Odom and his wife, Stephanie Odom ("Stephanie"), "were headed home" leaving a dinner at his sister Rhonda's house; he left "to go lock the gates there in town." Soon after, Odom's sister, Jackie Moss ("Jackie") left Rhonda's house with Odom's dad to take Jackie back to the "safe house" called "Reach,"[4] where she was staying. Jackie's kids were also in the vehicle and were staying at the safe house. Odom explained Reach was "[f]or women that need to get away from their spouses, whether it's physical, mental, whatever it may be."
Odom's dad called him to say Moss had begun following Odom's dad and Jackie. Odom went towards them, towards the house. His dad did not want Moss to know where he was taking Jackie. Odom passed Defendant, who was driving a Pontiac Montana Minivan. As Odom headed out of town, Defendant-who had turned around towards town-tapped his brakes. Odom then turned around to head back towards town. As both cars headed up a hill, Defendant pulled over at the top of the hill, on the other end of the square from Reach. Odom pulled up beside Defendant's vehicle.
The two men were "cussing back and forth," with Odom "cussing across [his] wife." Odom then backed up behind Defendant, got out of the car, and started to walk up to Defendant's vehicle. As Odom approached Defendant's vehicle from the rear, Defendant tried to "back over" him. Odom sought to get Defendant to "just leave [Jackie] alone." He told Defendant, "it's over, just let it go and go on." Defendant "kept telling [Odom] ... [i]t ain't none of your business[.]" During cross-examination, Odom admitted he was "angry" at Defendant, put himself in the middle of Defendant and Jackie's marriage, and intended to confront Defendant when he turned around in his vehicle and approached Defendant.
Odom testified he never touched the vehicle, never stepped closer to it than beyond the parking space, and remained in the same position that he was-standing at the parking spot, outside of the white dividing line between the parking space and the highway. He did not step into Defendant's parking space. He described the distance between Defendant, when sitting in the driver's side of his vehicle, and himself, when standing on the other side of the white line in the parking lot, to be about an "arm length." He said Defendant was "maxed out when he hit [Odom]."
The next thing he knew, he "thought [Defendant had] just hit [him] in the stomach." Odom did not know Defendant had stabbed him until he "reached down and felt the blood that was on [his] fingers." Defendant had struck him in the abdomen. Defendant stated: "I told you I'd f---ing kill you." Defendant was "pulling forward before the knife [came] out of [Odom's] stomach." Defendant's hand was still on the knife as "the vehicle was rolling forward."
Defendant pulled away from the parking lot, and Odom turned and walked back to his vehicle where Stephanie had waited in the passenger seat during the altercation. As Stephanie tried to call 911, Odom began driving towards his house, and then decided to go to the EMS office. He decided to go to the fire and rescue building because he was "[g]etting faint[,] [f]eeling like [he] was going to pass out." He explained at the fire and rescue station that he had been stabbed and needed to sit down. Odom laid down on the table, and the fire and rescue workers checked his wound. Paramedics arrived, took Odom to the EMS office, put him in a helicopter, and airlifted him to Erlanger Hospital in Chattanooga, Tennessee. He reported his injuries "went through [his] gallbladder, nicked - or cut [his] liver and nicked the main artery in the stomach."
2. Stephanie's Version
The State called Stephanie, Defendant's sister-in-law. Stephanie had been married to Wayne Odom since 2006. On 4 August 2015, Stephanie and Odom had been to Rhonda's house, trying to help with her kids and having dinner. To help Jackie make curfew at the Reach Center, they were cleaning up and getting ready. Stephanie, a passenger, left in a vehicle with Odom, who was driving, to "make sure [Defendant] wasn't sitting anywhere waiting on [Jackie and her three kids] to come out." Since they did not see Defendant along the way, she and Odom called to tell the rest of the family that it was okay for Jackie and the kids to leave for Reach.
They received a phone call from her father-in-law saying Defendant was sitting in a parking lot, and he had pulled out behind and followed her father-in-law, Jackie, and her three kids. Stephanie testified her father-in-law was not going to drive to the Reach house because he, Jackie, and the kids did not want Defendant to know where they were going.
At about 10:00 or 10:30 p.m., as Stephanie and Odom passed Defendant's car, Defendant "started tapping his brakes ... in a sequence" at them, which she believed indicated he wanted them to stop. Stephanie and Odom turned around in order to give Defendant a "detour" so the other car could come the back way into Reach. They saw Defendant parallel parked in a parking space and pulled up next to him.
The interaction with Defendant was not "ugly" at first. Odom told Defendant "you need to let this go, it's only going to make it worse, [you] don't want to lose your kids, there's nothing you can do at this point, just let it go for now." Defendant got "agitated," things "heated up," and the men began "yelling back and forth at one another." Defendant tried to "goat [sic]" Odom; Odom then pulled in to a parking space behind Defendant. Odom, who had no weapon, got out of his vehicle, and as he started towards Defendant's vehicle, Defendant's reverse lights came on and he "tried to back over [Odom]." Odom was "facing directly toward the vehicle[,]" outside of the rectangular line of the parking space. Stephanie testified her view was not obstructed, and she could clearly see what went on between the two men. She then saw Defendant's "arm come out of the vehicle" and into her husband's chest. While Defendant's arm was out of the vehicle, he started to drive away. Odom tried to get back to his car to get help. Stephanie could tell Odom was "in shock," she tried to call 911 but could not get a signal, and they drove to the rescue squad building. Stephanie next saw Odom at Erlanger Hospital.
3. Testimony of Sergeant Daniel Sherrill
The State called Sergeant Daniel Sherrill.[5] On 4 August 2015, Sergeant Sherrill was on "normal patrol" for the Clay County Sheriff's Office when he was dispatched to the Fire Department in Clay County regarding a stabbing. When he arrived, Odom, who had been stabbed, was on a table and EMS had bandaged him up. He asked Odom who had stabbed him; Odom replied Defendant. He also took a statement from Stephanie. Another officer located Defendant's vehicle, Sergeant Sherrill took out a warrant for Defendant's arrest, and Defendant was delivered between 2:00 and 2:30 a.m. the next morning to Sherrill's custody in Clay County. Sergeant Sherrill recovered no weapons from either Defendant or Odom.
4. Testimony of Paramedic Benjamin English[6]
The State called Benjamin English, a paramedic for Clay County EMS. On 4 August 2015, at 10:00 or 10:30 p.m., he responded to a call to service at the Fire Department in Hayesville. He saw Odom on the table, observed Odom's puncture wound and condition, and called for a helicopter to take Odom to Erlanger Hospital. Based on his training and experience, he believed the wound to be a "smooth laceration" caused by "[a] sharp piece of metal; usually glass, metal, something like that."
5. Defendant's Version
a. Motion to Dismiss
At this point in the trial, Defendant orally made a motion to dismiss the charge of assault with a deadly weapon. Defendant argued the State produced no testimony as to anyone who saw the knife nor evidence about a knife. Counsel for defense argued "the State is missing a crucial part of its case at this point[,] notwithstanding [Defendant's] self-defense defense." The court denied the motion.
b. Defendant's Testimony
Defense counsel called Defendant. On 4 August 2015, Defendant was headed "to the bypass" to get cigarettes. His arm was "shattered" with the "bone ... still sticking out," but he drove himself because he had no one else to drive him. As he traveled, he saw his wife, from whom he was separated, "coming through," and he "kind of flickered [his] lights because just within a few days before that she quit answering the phone[.]" He "presume[d]" his children were with her, but he could not see because of dark, tinted windows. Defendant "wanted to see [his] kids ... wanted to know what was going on." It had been "[t]hree or four days" since he had heard from them, but prior to that he heard from them "every day." He testified he "had no idea" his wife and kids had been staying at the Reach house.
Defendant flashed his lights, pulled out behind her car, and flashed his lights "a couple times" again. He could tell "she was really pulling away." After her car sped up, he did not pursue it further. As Defendant headed back towards town, he saw Odom. He did not recall hitting his brakes, flashing his lights, making a motion, or trying to stop Odom. His drink turned over as he turned up the hill, spilling onto CDs and such, so he pulled into the parking spot. Because of his broken arm, he had to "reach around" across the middle console with his shattered left hand.
While picking up his CDs and drink, Defendant heard Odom's car approaching. He was "nervous" and had "fear wondering how many people's gonna get out of the truck or what's going on, just anxiety and fear." Odom pulled up beside him, they began "talking back and forth," and Odom said "something like ... what are you doing following my sister around?" Defendant replied, "I tried to flash the lights at [Jackie] because I wanted to see my kids." The tone was "okay" at first, but the "tension started real quick" and was "different." Initially, they only "exchanged words ... mainly about the kids or whatever .... [b]ut it escalated then."
Defendant saw Odom next to his car, and because Odom had "busted" his arms and hands, he wondered how many people were in Odom's truck who might "jump out." Odom said "I'm just going to finish this[']" which Defendant took to mean he assumed Odom "was going to pick up where [Robinson] left off." Odom then parked behind Defendant and walked up to the van. Defendant testified he "didn't try to back over him[.]" Defendant was "scared to death." He asked Odom "not to do this" because with broken bones, he knew he couldn't fight back. Defendant had not had surgery; his arm and hand were still shattered, his skull was still fractured.
In voir dire, Defendant stated he was concerned about "[f]ights and stuff ... just knowing who [Odom] is and what he's done, capable of[.]" The injuries he sustained from the previous ball bat incident affected the way he felt about his ability to defend himself. He "couldn't fight [because his] hand was shattered and [his] arm was crushed ... [He] was not capable or swinging anything else, even with [his] fist." He "mainly" had two fingers to "work with." As Odom approached Defendant's vehicle, Defendant said, "this is how you're going to whip me, with my arms crushed and ... broken bones[.]"
Defendant testified Odom was "a lot closer than what" Odom and Stephanie remembered, because Defendant "couldn't extend [his] arms out." As Odom got "right up to the window" of Defendant's van, Defendant saw Odom's pocketknife that he "always carries[.]" Defendant "lean[ed] over" to the console and "got a pencil or a screwdriver or a knife[.]" In the console, Defendant "kept everything, just screwdrivers, pens, pencils, just little knives of different sorts."
Defendant did not know what he stabbed Odom with. He just knew he "had to do something to defend [himself]." He had no other way to defend himself, because of his injuries. In thinking after the stabbing, he thought Odom "usually has a gun with him all the time," since he owns a firearm, or "wondering if his wife was going to get out of the vehicle with a gun ... and shoot at [him]."
After the stabbing incident, Defendant went to his girlfriend's house in Hiawasee, Georgia to explain what happened. Defendant's subsequent surgery from the July incident required "cut[ting] the meat off the bone" and "put[ting] steel plates in it."
c. Motion to Dismiss
At the close of the evidence, outside the presence of the jury, Defendant renewed his motion to dismiss. During the hearing on the motion, defense counsel raised the issue that Defendant "may have immunity from criminal prosecution even because he used self-defense." The court denied the motion. The court then stated:
[A]s to 14-51.2, which the D.A. advises me is what he thinks you were talking about, I don't believe ... it is applicable. It doesn't fit the factual situation of this case. Now, that does not say that I'm not going to entertain the possibility of including the fact that your client, in his motor vehicle, doesn't have to retreat. But we'll deal with that.
The court asked if there were other matters to discuss prior to the charge conference; both counsel replied there was "nothing" more. The court asked, "Any tailor-made instructions in writing that the parties wish to urge upon the Court?" Neither counsel provided any. The State requested, however, "to be heard about the self-defense instruction at the appropriate time." The court indicated it would cover that. To another request about "tailor-made" instruction, defense counsel stated: "I'm fine with the pattern jury instructions."
d. Charge Conference
The court conducted an on-the-record charge conference. The trial court stated it would charge the jury with combined N.C.P.I.-Crim. 208.15, ASSAULT WITH A DEADLY WEAPON INFLICTING SERIOUS INJURY with N.C.P.I.-Crim. 308.40, SELF-DEFENSE-ASSAULTS NOT INVOLVING DEADLY FORCE. The trial court read the proposed instruction. The State objected to instructing that Defendant had no duty to retreat. According to the State, the "no duty to retreat" provision would apply "when the initial assault for which self-defense is being asserted or the assault which is being tried takes place within the confines of the vehicle." The State explained, "there has been no evidence ... that Mr. Odom was entering the vehicle, attempting to enter the vehicle or attempting to remove Mr. Moss from the vehicle." Counsel for defense objected to the removal of the language, because
there was evidence that showed that part of Mr. Odom did enter the car. He did enter the vehicle through the window. [Defendant] testified that [Odom] kept getting closer and closer and that he was almost inside the car and then he said that - later that there was blood on his pants from Mr. Odom. ... So [Odom] had to have put some part of his body into that car at that point.
The court ruled it would delete the "no duty to retreat" language, stating "14-51 is not at play here ... because there was no attempt to enter the vehicle[.]"
Looking at the self-defense instruction, the State noted that because a felonious assault had been alleged, the correct self-defense instruction was N.C.P.I.-Crim. 308.45, "SELF-DEFENSE-ALL ASSAULTS INVOLVING DEADLY FORCE." Calling it to the court's attention, the State explained it was the correct instruction to use because: "Such assaults include all felonious assaults, misdemeanor assaults, such as assault with a deadly weapon, assault by pointing a gun and may include assault inflicting serious injury." The court agreed to "revise [its] instruction as to the substantive offense and as to the defense of self-defense." That instruction has identical language to N.C.P.I.-Crim. 308.40 as to the "no duty to retreat" language. Again, the trial court read the proposed instruction, leaving out the "no duty to retreat" language. Defense counsel stated, "I don't have any objection to that, Your Honor. That[ ] sounds fine to me." The State noted from the Pattern Jury Instruction a section saying "self-defense is justified only if the defendant was not the aggressor." The court replied it was "not going to get into that [.]" The trial court then instructed the jury accordingly, leaving out the "no duty to retreat" language.
e. Jury Instructions, Deliberations, and Verdict
Following closing arguments, the court instructed the jury and included multiple instructions as to the justification of self-defense. Neither counsel offered corrections to the instructions.
During deliberations, the jury sent a note to the court asking: "Under the law did Mr. Moss have the obligation to flee the scene of the accident and should this be held against him, Mr. Moss if so?" The court discussed with counsel the question's lack of clarity. Defense counsel opined "in the context of everything they're probably asking did [Defendant] have to retreat or did he have to leave if he could before anything happened[?]" With counsels' consent, the court asked the jury for clarification, and asked for their response in writing. The jury replied: "The additional verbiage is before or during the stabbing[.]" The trial court and counsel further discussed the question; defense counsel noted "it just seems ... they're confused as to whether he had an obligation to leave - to leave rather than to use force - or before he used force." Defense counsel had no further suggestions. The State further discussed the instructions, verbiage to which the jury might be referring, "no duty to retreat" language, and whether additional "wordy" language would "just confuse [the jury] further."
The trial court noted there was "no evidence ... of any attempt by the [D]efendant to quit the fray." The court also stated it was "in dispute" as to whether Defendant was the aggressor. After further discussing self-defense instructions and unsettled case law, the court received notice the jury had a verdict.
Upon the jury's return, the members unanimously indicated that the question they originally sent out was no longer relevant to their deliberations. On 30 August 2017, the jury returned a unanimous verdict finding Defendant guilty of assault with a deadly weapon inflicting serious injury.
f. Sentencing
The trial court sentenced Defendant to no less than 25 and no greater than 42 months, as an active sentence.
g. Notice of Appeal
On 31 August 2017 Defendant gave notice of appeal.
II. Jurisdiction and Petition for Writ of Certiorari
As an initial matter, we address Defendant's notice of appeal. The judgment entered 30 August 2017 was a final judgment of the Clay County Superior Court. Defendant appealed pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-1444(a) (2017). In the event this Court deemed Defendant's appeal barred, Defendant concurrently filed a petition for writ of certiorari, pursuant to Rule 21(a)(1) of the N.C. Rules of Appellate Procedure. N.C. R. App. P. 21(a)(1) (2016).
Appellate Rule 4, which governs entry of notice of appeal in criminal cases, states:
(a) Manner and Time. Any party entitled by law to appeal from a judgment or order of a superior or district court rendered in a criminal action may take appeal by
(1) giving oral notice of appeal at trial
....
N.C. R. App. P. 4(a) (2016).
Here, defense counsel did not enter oral notice of appeal immediately after judgment was entered, but rather entered oral notice of appeal on return to court the following day, after the court's recess from the previous day's proceedings. In our discretion, we grant Defendant's petition and consider the merits of his appeal.
III. Analysis
Defendant assigns error to the trial court for (1) failing to instruct the jury that Defendant had no duty to retreat; (2) failing to intervene in the "grossly improper" prosecutor's argument; and (3) allowing the prosecutor to cross-examine Defendant concerning his rights to silence and to counsel.
A. Jury Instruction
1. Standard of Review
This Court reviews de novo a trial court's decision to deny a requested jury instruction. State v. Osorio , 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." State v. Biber , 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) (citations and internal quotations omitted).
Under our Rules of Appellate Procedure, "[a] party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires[.]" N.C. R. App. P. 10(a)(2) (2016). Our State Supreme Court has, however, "elected to review unpreserved issues for plain error when they involve ... errors in the judge's instructions to the jury[.]" State v. Gregory , 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996). "Under plain error review, a defendant must demonstrate that the trial court committed 'a fundamental error.' " State v. May , 368 N.C. 112, 119, 772 S.E.2d 458, 463 (2015) (quoting State v. Towe , 366 N.C. 56, 62, 732 S.E.2d 564, 568 (2012) ). Plain error arises when the error is " 'so basic, so prejudicial, so lacking in its elements that justice cannot have been done[.]' " State v. Odom , 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting United States v. McCaskill , 676 F.2d 995, 1002 (4th Cir. 1982) ). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." State v. Jordan , 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993) (citation omitted).
2. Defendant's Entitlement to "No Duty to Retreat" Jury Instruction
Defendant argues the trial court erred by failing to instruct the jury that he had no duty to retreat before using deadly force. Defendant argues this error was prejudicial because he was entitled to an instruction that he had no duty to retreat, and that "but for the trial court's error, there is a reasonable probability at least one juror would not have voted to convict." We agree.
a. Preservation of Argument
We first address the State's argument that Defendant failed to properly preserve for appellate review the omission of the "no duty to retreat" provision from the jury instruction or that it was invited error. In support of its argument, the State contends "not only did Defense counsel not object, but she affirmatively agreed to the instruction[.]"
Defendant argues, conversely, the issue is preserved absent request or objection. Defendant further argues the issue is preserved by defense counsel's objection to the first proposed instruction.
Under North Carolina Rules of Appellate Procedure 10(a)(2), "[a] party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto[.]" Moreover, a defendant who "actively agreed" to a proposed instruction has invited any error therein. State v. Thompson , 359 N.C. 77, 104, 604 S.E.2d 850, 870 (2004), cert. denied , 546 U.S. 830 (2005). A defendant who invites error waives the right to appellate review concerning the invited error, including plain error review. State v. Spence , 237 N.C. App. 367, 375, 764 S.E.2d 670, 677 (2014) (citation omitted). Rule 12 of the North Carolina Rules of Superior and District Courts instructs, however, that "[c]ounsel should yield gracefully to rulings of the court[.]" N.C. R. Super. & Dist. Cts. R. 12.
Here, during the initial discussion of the self-defense instruction, defense counsel objected to removing the "no duty to retreat" language from the proposed instruction. The trial court specifically ruled it would not instruct the jury that Defendant did not have a duty to retreat, based on the court's belief that the instruction was "not at play here ... because there was no attempt [by Mr. Odom] to enter [Defendant's] vehicle[.]" The trial court subsequently read the correct, nearly identical instruction, which also omitted the same "no duty to retreat" language. Defense counsel responded, "I don't have any objection to that, Your Honor. That[ ] sounds fine to me." The court then read to the jury the agreed-upon instruction.
The question, then, is whether defense counsel's objection to the first proposed jury instructions remained, pertaining to the "no duty to retreat" provision, and thus preserved the objection to the instruction that was actually given. We find that it did.
Defense counsel did not agree to the proposed instruction regarding its lack of requested "no duty to retreat" language, see Thompson , 359 N.C. at 104, 604 S.E.2d at 870, but rather chose, as a general rule of practice, to yield to the court by agreeing to the proposed instruction. See N.C. R. Super. & Dist. Cts. R. 12. There was no difference between the two instructions such that counsel would believe the trial court would change its previous decision on the "no duty to retreat" provision for a similar jury instruction. Moreover, the record shows counsel did not invite error by waiving objection to the instruction in the main charge. See Spence , 237 N.C. App. at 375, 764 S.E.2d at 677. Responding to a discussion about including the requested instruction, the trial court stated it would not give the language about a "non-duty to retreat in your car" because it did not "match the facts of this case .... I think it was proper the first time and remains proper for us to delete that language."
As to the "no duty to retreat" requested instruction, we find the issue preserved for appellate review and thus review the merits of Defendant's argument.
b. Jury Charge and Justification for Using Deadly Force
"The jury charge is one of the most critical parts of a criminal trial." State v. Walston , 367 N.C. 721, 730, 766 S.E.2d 312, 318 (2014). "[W]here competent evidence of self-defense is presented at trial, the defendant is entitled to an instruction on this defense, as it is a substantial and essential feature of the case ...." State v. Morgan , 315 N.C. 626, 643, 340 S.E.2d 84, 95 (1986) (citations and emphasis omitted); see State v. Guss , 254 N.C. 349, 351, 118 S.E.2d 906, 907 (1961) (per curiam) ("The jury must not only consider the case in accordance with the State's theory but also in accordance with defendant's explanation.").
State v. Lee , 370 N.C. 671, 674, 811 S.E.2d 563, 565-66 (2018) (alterations in Lee ).
"Our courts have recognized that a defendant may use either deadly force or nondeadly force to defend himself, depending on the circumstances of each case." State v. Whetstone , 212 N.C. App. 551, 558, 711 S.E.2d 778, 783 (2011). "Deadly force is 'force intended or likely to cause death or great bodily harm[,]' and nondeadly force is 'force neither intended nor likely to do so[.]' " Id ., 711 S.E.2d at 783 (quoting State v. Pearson , 288 N.C. 34, 39, 215 S.E.2d 598, 602 (1975) (alterations in Whetstone )). As set forth by our Supreme Court in Lee , North Carolina's General Statutes provide two circumstances in which individuals are justified in using deadly force in self-defense, thus excusing them from criminal culpability. 370 N.C. 671, 674, 811 S.E.2d 563, 566 (2018). First, under N.C. Gen. Stat. § 14-51.3, entitled "Use of force in defense of person; relief from criminal or civil liability":
(a) A person is justified in using force, except deadly force, against another when and to the extent that the person reasonably believes that the conduct is necessary to defend himself or herself or another against the other's imminent use of unlawful force. However, a person is justified in the use of deadly force and does not have a duty to retreat in any place he or she has the lawful right to be if either of the following applies:
(1) He or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another.
(2) Under the circumstances permitted pursuant to G.S. 14-51.2.
N.C. Gen. Stat. § 14-51.3 (a) (2017) ; see also Lee , 370 N.C. at 674, 811 S.E.2d at 566. Second, under N.C. Gen. Stat. § 14-51.2, entitled "Home, workplace, and motor vehicle protection; presumption of fear of death or serious bodily harm":
(b) The lawful occupant of a home, motor vehicle, or workplace is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:
(1) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home, motor vehicle, or workplace, or if that person had removed or was attempting to remove another against that person's will from the home, motor vehicle, or workplace.
(2) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.
....
(f) A lawful occupant within his or her home, motor vehicle, or workplace does not have a duty to retreat from an intruder in the circumstances described in this section.
N.C. Gen. Stat. § 14-51.2(b), (f) (2017). Both sections provide that individuals using force as described are immune from civil or criminal liability,[7] and such individuals have no duty to retreat before using defensive force. Id . §§ 14-51.2(f), -51.3(a); see also Lee , 370 N.C. at 674-75, 811 S.E.2d at 566.
Our Supreme Court explained in Lee , "[t]he relevant distinction between the two statutes is that a rebuttable presumption arises that the lawful occupant of a home, motor vehicle, or workplace reasonably fears imminent death or serious bodily harm when using deadly force at those locations under the circumstances in N.C.G.S. § 14-51.2(b)." Lee , at 675, 811 S.E.2d at 566. Further, "[t]his presumption does not arise in N.C.G.S. § 14-51.3(a)(1)." Id ., 811 S.E.2d at 566.
The Court clarified: "the phrase 'any place he or she has the lawful right to be' is not limited to one's home, motor vehicle, or workplace, but includes any place the citizenry has a general right to be under the circumstances." Id ., 811 S.E.2d at 566 n.1 (citation omitted). "Under either statutory provision, a person does not have a duty to retreat, but may stand his ground." Id ., 811 S.E.2d at 566.
"Thus, wherever an individual is lawfully located-whether it is his home, motor vehicle, workplace, or any other place where he has the right to be-the individual may stand his ground and defend himself from attack when he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself or another."
State v. Bass , --- N.C. ----, ---- 819 S.E.2d 322, 326 (2018).
"[W]hen ... the defendant presents competent evidence of self-defense at trial, the trial court must instruct the jury on a defendant's right to stand his ground, as that instruction informs the determination of whether the defendant's actions were reasonable under the circumstances, a critical component of self-defense." Lee , 811 S.E.2d at 675 (citing State v. Blevins , 138 N.C. 668, 670-71, 50 S.E. 763, 764 (1905) (" '[The] necessity, real or apparent, [is] to be determined by the jury' and the defendant 'can have that necessity determined in view of the fact that he has a right to stand his ground ....' " (alterations in Lee )). Moreover, "it is clear that a defendant entitled to any self-defense instruction is entitled to a complete self-defense instruction, which includes the relevant stand-your-ground provision." Bass , --- N.C. at ----, 819 S.E.2d at 326 (citing Lee , 370 N.C. at 674-75, 811 S.E.2d at 566 ).
Here, the trial court allowed testimony regarding the previous July altercation to show Defendant's intent and state of mind related to his self-defense assertion and to whether he was the aggressor. Defendant offered ample evidence at trial that he acted in self-defense when he stabbed Odom. Defendant sat in his vehicle on a public street where he had a right to be; as Odom approached, he acted out fear because of the July incident and his resulting injuries. The State argued Defendant was not entitled to a self-defense instruction since Defendant was the aggressor, and cross-examined him concerning his failure to retreat. Defendant argued, however, that Odom was the aggressor and the blood in Defendant's car supported his assertion that some part of Odom entered the car through the window.
In its jury instructions, the trial court instructed the jury could consider whether Defendant's actions were excused, justified, or reasonable because Defendant acted in self-defense. The court did not, however, instruct the jury that Defendant could stand his ground and had no duty to retreat. Taken in the light most favorable to Defendant, on these facts, Defendant was entitled to a complete jury instruction on self-defense. See Bass , --- N.C. at ----, 819 S.E.2d at 326.
In addition to Defendant's appropriate request for such instructions and preservation of review, the record reflects a reasonable possibility that, had the trial court given the required "no duty to retreat" instruction, a different result would have been reached at trial. See Lee , 370 N.C. at 676, 811 S.E.2d at 567 (quoting State v. Ramos , 363 N.C. 352, 355-56, 678 S.E.2d 224, 227 (2009) ("applying 'reasonable possibility' of 'different result' standard to determine whether erroneous instruction was prejudicial")). During closing argument, the State referenced multiple times Defendant's ability to have driven away from where he was parked. Such "omission of the stand-your-ground instruction permitted the jury to consider defendant's failure to retreat as evidence that his use of force was unnecessary, excessive, or unreasonable." See id ., 811 S.E.2d at 567 (quoting State v. Smith , 360 N.C. 341, 346, 626 S.E.2d 258, 261 (2006) ("The purpose of a jury instruction 'is to give a clear instruction which applies the law to the evidence' and thus 'assist the jury in understanding the case and in reaching a correct verdict.' ")). The jury expressed concern, as shown by their note of inquiry during deliberations, about whether Defendant had a duty to retreat. Therefore, but for the trial court's error, there is a reasonable possibility that at least one juror would not have voted to find Defendant guilty. Accordingly, Defendant is entitled to a new trial with proper instructions on self-defense.
f. Conclusion
We conclude that by omitting the "no duty to retreat" provision, the trial court's jury instructions constituted preserved error. Defendant has shown a reasonable possibility that, had the trial court included the "no duty to retreat" provision in its instructions, a different result would have been reached at trial. See N.C. Gen. Stat. § 15A-1443(a). Accordingly, we reverse the decision of the trial court on this issue and remand this case to the trial court for a new trial with proper instructions on self-defense and no duty to retreat.
B. Trial Court's Failure to Intervene in Prosecutor's Closing
Defendant next assigns error to the trial court for "failing to intervene in the prosecutor's grossly improper argument insinuating [Defendant] had a duty to retreat" from the altercation with Odom, and that "he should be found guilty because he did not do so." The State contends Defendant's argument lacks merit whereby the related issues were not preserved, there was no evidence the prosecutor made such an argument, and there is no evidence the prosecutor misstated the law.
1. Standard of Review
"[T]o preserve a question for appellate review, a party must have presented the trial court with a timely request, objection or motion, stating the specific grounds for the ruling sought if the specific grounds are not apparent." State v. Eason , 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991) ; see also N.C. R. App. P. 10(a)(1) (2016). This Court's review is limited to "the record on appeal, the verbatim transcript of proceedings, if one is designated, and any other items filed pursuant to ... Rule 9." N.C. R. App. P. 9(a) (2016). This Court is precluded from addressing alleged error in the prosecutor's argument unless a defendant provides a transcript of the argument in question. State v. Ussery , 106 N.C. App. 371, 375, 416 S.E.2d 610, 612 (1992).
We will not find error in a trial court's failure to intervene in closing arguments ex mero motu unless the remarks were so grossly improper they rendered the trial and conviction fundamentally unfair. In determining whether argument was grossly improper, this Court considers the context in which the remarks were made, as well as their brevity relative to the closing argument as a whole[.]
State v. Taylor , 362 N.C. 514, 536, 669 S.E.2d 239, 260 (2008), cert. denied Taylor v. North Carolina , 558 U.S. 851, 130 S. Ct. 129 (2009) (internal quotations and citations omitted).
2. Failure to Intervene
Here, there is no verbatim transcript as to the closing arguments; rather, the transcript merely indicates an approximate thirty minute time frame during which counsel made closing arguments. The record does contain, however, a brief "Statement Concerning Proceedings" which reads as follows:
The prosecutor stated multiple times during his closing argument that during the August 4, 2015 altercation with Mr. Odom, Mr. Moss could have just driven away from where he was parked because there was nothing blocking his path, and that Mr. Moss was looking for a fight, based on Mr. Moss' testimony that he was not a coward or one to run from a fight.
While Defendant urges the "prosecutor's argument insinuated [Defendant] should be found guilty because he was at fault for not driving away[,]" this Court cannot determine, given the overall context and brevity of information provided for review, that the remarks were "so grossly improper" as to render the proceeding "fundamentally unfair." See id ., 669 S.E.2d at 260. To any extent the Statement Concerning Proceedings reflects the closing argument, the prosecutor's comments were supported by evidence presented at trial.
Moreover, nothing in the record indicates Defendant objected to any alleged impropriety by the prosecutor in making closing arguments. For these reasons, we find no error in the trial court's failure to intervene ex mero motu , and Defendant is not entitled to relief on the basis of this component of his challenge.
C. Trial Court's Failure to Intervene in Prosecutor's Questions About Silence
Defendant next argues the trial court erred by allowing the prosecutor to cross-examine Defendant concerning his post-arrest silence and conversations with his attorney. Defendant argues the trial court's failure to intervene was plain error, where Defendant's only defense was self-defense. The State argues Defendant failed to properly preserve the issue for appeal where he did not object during trial. Further, according to the State, the "transcript shows that Defendant overstates the nature of the questions asked[.]"
During the prosecutor's cross-examination of Defendant, the prosecutor briefly questioned Defendant about his interactions after the stabbing. In that line of questioning, the prosecutor inquired:
Q: So Mr. Moss, you went to Hiawasee, Georgia to your girlfriend's to tell her what had happened, to explain what had happened?
A: Yeah.
Q: Does she work in law enforcement in any capacity?
A: No.
Q: Certainly doesn't work for the Clay County Sheriff's Office?
A: No.
Q: Well, you didn't explain to them what happened, did you, Mr. Moss?
A: Who?
Q: The Clay County Sheriff's Office.
A: No, I didn't. I -
Q: No, you didn't. This is the first time -
A: But -
Q: - that you have explained to anyone other than your girlfriend and maybe your Defense attorney what happened; isn't that correct?
A: Yeah, they say not to say anything -
Q: Okay.
A: - to - your lawyer -
[Prosecutor]: I don't have any further questions.
Through these questions, the prosecutor established Defendant did not "explain to [law enforcement] what happened," nor did he "explain to anyone other than [his] girlfriend and ... Defense attorney what happened[.]"
1. Standard of Review
"[T]o preserve a question for appellate review, a party must have presented the trial court with a timely request, objection or motion, stating the specific grounds for the ruling sought if the specific grounds are not apparent." Eason , 328 N.C. at 420, 402 S.E.2d at 814 ; see also N.C. R. App. P. 10(a)(1). This Court's review is limited to "the record on appeal, the verbatim transcript of proceedings, if one is designated, and any other items filed pursuant to Rule 9." N.C. R. App. P. 9(a). This Court is precluded from addressing alleged error in the prosecutor's argument unless a defendant provides a transcript of the argument in question. Ussery , 106 N.C. App. at 375, 416 S.E.2d at 612.
Defendant asserts "[b]oth the United States Supreme Court and our courts have recognized that it is a constitutional violation for the State to impeach a defendant with his post-arrest exercise of his constitutional rights to silence and to counsel." Although Defendant contends he is thus entitled to relief from his convictions, Defendant's argument ignores that fact that he did not object to these questions and prosecutorial comments on which his claim is based. Given the absence of a contemporaneous objection, Defendant's challenge to the prosecutor's questions must be reviewed utilizing a plain error standard. See State v. Mendoza , 206 N.C. App. 391, 395, 698 S.E.2d 170, 174 (2010) (stating that, since defendant "did not ... object to ... any of [the] testimony at trial ... we ... review the admission of the testimony only for plain error").
2. Plain Error Analysis of Prosecutorial Questions
In North Carolina, the plain error standard of review "applies only when the alleged error is unpreserved, and it requires the defendant to bear the heavier burden of showing that the error rises to the level of plain error." State v. Lawrence , 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012) (citation omitted). In North Carolina, plain error review is "normally limited to instructional and evidentiary error." Id. , 723 S.E.2d 333 (citation omitted). "Historically, in conducting plain error review, our appellate courts have considered whether the error was prejudicial and whether it resulted in a miscarriage of justice." Id. at 517, 723 S.E.2d 334 (citing Odom , 307 N.C. at 661, 300 S.E.2d at 379 ). To determine whether an error is prejudicial, our courts examine the entire record to determine if the error "had a probable impact on the jury's finding of guilt." Id. at 517, 723 S.E.2d at 334 (emphasis in original) (citation omitted).
As discussed in detail supra , Defendant and Odom had been involved in an altercation prior to the stabbing. The record established animosity existed between the two. Defendant does not dispute having stabbed Odom. After carefully reviewing the record, we conclude the principal focus of the questions the prosecutor posed to Defendant on cross-examination related to Defendant's failure to make a statement to investigating officers, and the prosecutor's questions of Defendant related to both Defendant's pre-arrest and his post-arrest silence. The prosecutor did not question Defendant precisely as to Defendant's right to counsel, nor is there support in the record the prosecutor argued to the jury as to Defendant's guilt, based specifically on Defendant's answers to this brief exchange. Moreover, Defendant failed to object to this line of questions and never challenged before the trial court the constitutionality of the prosecutor's conduct.
As a result, we are unable to say, looking at the entire record and given the specific facts at issue here, that the outcome at Defendant's trial would probably have been different had the challenged question not been asked, or that the prosecutor's conduct deprived Defendant of a fair trial. The trial court's failure to preclude the prosecutor from posing these few questions to Defendant did not rise to the level of plain error or render Defendant's trial fundamentally unfair. Accordingly, Defendant is not entitled to relief on the basis of this component of his challenge to the trial court's judgments.
IV. Conclusion
For the foregoing reasons, the trial court erred in not providing jury instructions containing the "no duty to retreat" provision. The trial court committed no error in failing to intervene in the prosecutor's argument or in the prosecutor's cross-examination of Defendant. Accordingly, we reverse the decision of the trial court in part, find no error in part, vacate Defendant's conviction, and remand the case for further proceedings.
REVERSED IN PART AND REMANDED; NEW TRIAL.
Report per Rule 30(e).
Chief Judge McGEE and Judge HAMPSON concur.

Documents associated with this case refer to Defendant as Samuel Elton Moss, Elton Moss, and Elton Samuel Moss. Witness Stephanie Odom testified "his name is Samuel Elton Moss[,] [n]ot Elton Samuel." The transcript lists him as Samuel Elton Moss, and Defendant stated his name as such. Briefs filed with this Court refer to Defendant as Elton Samuel Moss, which is how this Court refers to him.

The indictment specified the assault was "with a knife, a deadly weapon, inflicting serious injury." The record contains no other proof the implement used was a knife.

Odom testified he "was" Defendant's brother-in-law, and Defendant "was" married to his sister. Upon further questioning, he said he was "not a hundred percent sure" whether his sister and Defendant were still married. He later testified his sister was married to Defendant at the time, but they were separated. Odom also referred to his sister as Defendant's "soon-to-be exwife."

Transcripts of the proceedings indicate various names used for the safe house, including, e.g. , "Reach,", "Reach house,", and "Reach Center,".

At the time of the incident at issue in this case, Sergeant Sherrill's rank was Corporal.

Mr. English was called out of order, after Defendant's testimony, because Mr. English was on duty and had an emergency call interrupting the schedule of witnesses. We include it here in grouping the State's witnesses.

"A person who uses force as permitted by this section is justified in using such force and is immune from civil or criminal liability for the use of such force[.]" N.C. Gen. Stat. §§ 14-51.2(e), - 51.3(b) (2017).